IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ICONIX, INC.,

            Plaintiff,

   v.

LANCE TOKUDA, ET AL.,

            Defendants.

_____/

No. C 06-2201 SBA

**ORDER**
**[Docket No.s 21, 82, 116, 130]**

United States District Court
For the Northern District of California

      This matter comes before the Court on Plaintiff's Motion for Preliminary Injunction [Docket No. 21], Defendants' Evidentiary Objections to the Declaration of Ronald Alepin and Jeff Wilbur [Docket No. 82], Plaintiff's Objections to Certain Evidence filed in Opposition to Motion for Preliminary Injunction and Motion to Strike [Docket No. 116], and Defendants' Objections to New Evidence and Argument in Iconix's Reply Memorandum [Docket No. 130].

### **BACKGROUND**[1]

      Plaintiff Iconix, Inc. ("Plaintiff" or "Iconix") is a corporation organized and existing under the laws of the state of Delaware with its principal place of business in Mountain View, California.

      Defendants in this matter are Lance Tokuda, Jia Shen, and netPickle, Inc. (collectively, "Defendants").

      Defendant Lance Tokuda ("Tokuda") is a former employee and officer of Iconix; Tokuda

---

[1] The facts contained in this section are alleged in the First Amended Complaint ("FAC") in this matter, except where otherwise specified.

resides in Foster City, California.

Defendant Jia Shen ("Shen") is a former employee of Iconix; Shen resides in East Palo Alto, California.

Defendant netPickle, Inc. ("Netpickle") is a corporation organized and existing under the laws of the State of Delaware and has its principal place of business in Foster City, California.

Plaintiff provides email identity services that proactively combat email fraud spawned by phishing. Phishing is a form of email fraud where senders impersonate legitimate businesses and organizations to try to get recipients to divulge personal information such as passwords and account numbers so the senders can steal the recipient's identity and/or funds from the recipient's account.

Tokuda and Shen began their employment at Iconix in December of 2004. Tokuda was the Vice President of Engineering and Chief Technology Officer at Iconix and was in charge of setting the engineering and development direction for Iconix and for managing the engineering team. Among other things, Tokuda supervised the development of Iconix's new intellectual property and ideas. Shen was the Manager of Client Development at Iconix, and his responsibilities included overseeing the work of software development.

As employees of Iconix, Tokuda and Shen both signed contracts entitled, "Proprietary Information and Inventions Assignment Agreement." These contracts are quoted in pertinent part below.

In the fall of 2005, Plaintiff was actively generating, developing, and evaluating ideas for increasing traffic to Plaintiff's website. This activity included developing new features that would entice consumers to download Iconix's email identity product ("email ID product"). Of particular interest to Iconix was the ability to penetrate community website such as www.myspace.com, where web users create profiles and socially network with one another. To implement this marketing strategy, Plaintiff created a separate website, called Uberfuze.com ("Uberfuze"), that was targeted directly at social networking users. Wilbur Decl. at ¶ 22.

2

In the fall of 2005, Iconix engineers, including Tokuda, discussed the idea of creating a feature that would rotate through a user's pictures.  The user would download Iconix's email ID product and then be able to use the feature.  Iconix continued to evaluate the feature and began to test it as a marketing strategy by the beginning of 2006.

In late December of 2005, Tokuda gave notice to Iconix.  Tokuda's last day of employment was January 23, 2006.

On or about January 20, 2006, Iconix discovered that in or around October 2005, while he was still an officer of Iconix, Tokuda secretly registered the domain name rockmyspace.com.  Prior to that time, Tokuda had covertly been developing a customizable slideshow feature for his own personal benefit.  While an Iconix officer, Tokuda also secretly formed his own company, Netpickle, for the purpose of exploiting the customizable slideshow feature for his own benefit.  Tokuda also began soliciting other Iconix personnel, including Shen, to join him in creating his own customizable slideshow business.  Tokuda's solicitation of Iconix employees and the Defendants' development of a competing customizable slideshow feature occurred on Iconix's company time and through the use of Iconix's computers.  Shen and Tokuda launched rockmyspace.com on the night of November 13-14, 2005.  Shen Decl. ¶ 56 ; Tokuda Decl. ¶ 59.

Since January, 2006, Tokuda and NetPickle registered the domain name rockyou.com.  Defendants currently market their customizable slideshow feature using the www.rockyou.com website.  Tokuda Decl. at ¶ 75.  (Defendants' slideshow technology and website are referred to collectively as "rockmyspace," "rockmyspace.com," "RockYou," and "rockyou.com."  These terms are used interchangeably.).  By February 19, 2006, rockmyspace had already exceeded 1.1 million registered users.  Wan Decl., Ex.  0, at NP002545.

When Iconix found out that Shen helped Tokuda take Iconix's ideas and property to form his own customizable slideshow business, Iconix was forced to terminate Shen's employment.

On March 13, 2006, Iconix sent Defendants a letter requesting that they return the customizable slideshow program and source code to its rightful owner, Iconix, and that they

cease and desist all other activity in which they are engaged that uses software or derivative works owned by Iconix.  Defendants refused to do so. On March 27, 2006, Plaintiff filed the original Complaint in this matter. On May 4, 2006, Plaintiff filed the instant Motion for Preliminary Injunction.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction to preserve the positions of the parties until a full trial can be conducted.  *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)).  When a party is seeking a preliminary injunction, he or she must show either: "(1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the moving party.  These standards 'are not separate tests but the outer reaches of a single continuum.'"  *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839- 40 (9th Cir. 2001) (citation omitted).  "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."  *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998) (citation omitted). "An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial."  *Optinrealbig.com, LLC v. Ironport Sys.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (Armstrong, J.).

Under the sliding scale theory, a party seeking an injunction "need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation."  *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993).  "Serious questions" are those which are "substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation."  *Senate of State of Cal. v. Mosbacher*, 968 F. 2d 974, 977-78 (9th Cir. 1992) (citing *Gilder v. PGA Tour, Inc.*, 936 F. 2d 417, 422 (9th Cir. 1991)); *Republic of the Philippines v. Marcos*, 862 F. 2d 1355,

1362 (9th Cir. 1988) ("'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo.").  Although the serious questions posed by the movant "need not promise a certainty of success, nor even a probability of success," he or she must nevertheless demonstrate a "fair chance of success" on the merits.  *Gilder*, 936 F.2d at 422. Finally, in cases where the public interest may be affected, the court must consider the public interest as a factor in balancing the hardships.  *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760, 766 (9th Cir. 2004) (citing *Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992)).

"'The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged except in a case clearly warranting it.'"  *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970).

## ANALYSIS

### A.      Objections to New Evidence in Iconix's Reply Brief

Defendants object to the new evidence and argument in Plaintiff's Reply Brief. Defendants request that the Court either strike the new evidence and argument or, alternatively, accept the supplemental declarations that Defendants have submitted to the Court.

Defendants cite to *Provenz*, in which the Ninth Circuit held that "where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond."  *Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) (citation omitted).

Plaintiff argues that the holding of *Provenz* applies only in the context of summary judgment motions.  The Court finds that Plaintiff's argument is erroneous.  The Ninth Circuit has applied the holding of *Provenz* to preliminary injunction motions, holding that "a district court may consider new evidence presented in a reply brief if the district court gives the adverse party

*United States District Court*
For the Northern District of California

an opportunity to respond," and finding no abuse of discretion where the district court heard and considered a response to new arguments raised, for the first time, in a reply brief. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1040-41 (9th Cir. 2003).

Plaintiff argues that any new arguments and evidence in its Reply "respond specifically to points raised in Defendants' oppositions" and states that "[e]ven if the court were to find that the rule of *Provenz* applied outside the summary judgment context . . . the court should nonetheless deny Defendants' request to strike the evidence and argument since Defendants have had an opportunity to respond" with their supplemental declarations. Because the rule of *Provenz* applies to preliminary injunction motions, the Court SUSTAINS Defendants' objection to the new evidence and argument in Plaintiff's Reply and accept the supplemental declarations filed with Defendants' objection, thus providing Defendants with a chance to respond.

**B.      Other Objections**

**1.      Paragraph 9 of Tokuda Decl. and Paragraph 49 of Shen Decl.**

Plaintiff objects to Paragraph 9 of the Tokuda Declaration and Paragraph 49 of the Shen Declaration on the grounds that these statements are parol evidence, inadmissible to contradict the terms of the Proprietary Agreements under California law. Defendants do not respond to these objections.

Paragraph 9 of the Tokuda Declaration states as follows:

> Months later, in late Spring of 2005 or early Summer of 2005, [Iconix's CEO] Mr. Picazo came to me with the Iconix Proprietary Information [and Inventions Assignment] Agreement and wanted me to sign it. I had signed similar agreements before, but this one bothered me. I felt it required me to disclose every idea I had whether it was related to Iconix or not, including ideas I had away from work. That was impractical since I have been doing start-ups for most of my entire career, and I often have multiple ideas in a day. I expressed my concern to Mr. Picazo and he said that he had used this form with his previous companies. He told me not to worry, "it's just Bob" and that the agreement was a formality. By this he was referring to Chief Financial Officer and General Counsel Bob Zager. Mr. Picazo said that he would never use the agreement against me and that even he had signed it. Based on what he said, I signed the agreement.

Tokuda Decl. at ¶ 9.

United States District Court
For the Northern District of California

Paragraph 49 of the Shen Declaration states as follows:

> When we first received our Proprietary Agreements in March / April 2005, I had concerns. They seemed overbroad. Lance [Tokuda] and I both asked for a revision before we signed. Months later, I was asked to sign a new, supposedly modified, Proprietary Agreement in haste. Mr. Picazo said he really needed me to sign it, and it was urgent that I do so. I was told that the agreement was a mere formality and was needed to complete my HR file. In response to my concerns, Mr. Picazo said that these things "would never be used" and "not to worry." I signed it in good faith based on Mr. Picazo's representations.

Shen Decl. at ¶ 49.

According to California Supreme Court, "The parol evidence rule is codified in Civil Code section 1625[2] and Code of Civil Procedure section 1856.[3]  It 'generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms

---

[2] "The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument." Cal. Civ. Code § 1625.

[3] California Code of Civil Procedure § 1856 states in pertinent part:

(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

(b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

(c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.

(d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

Cal. Code Civ. Proc. § 1856.

of an integrated written instrument.'"  *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (Cal. 2004).  "[T]he rule applies to any type of contract, and its purpose is to make sure that the parties' final understanding, deliberately expressed in writing, shall not be changed."  *Id.* at 345 (quotation omitted).

The parol evidence rule applies if the following two inquiries are answered affirmatively: "1) was the writing intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements; and 2) is the agreement susceptible of the meaning contended for by the party offering the evidence?"  *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 873 (Cal. Ct. App. 2002) (holding that the plaintiffs were not entitled to present testimony that they were induced to enter an automobile lease by promises that they could disregard terms of the lease).

In the instant case, the Proprietary Agreements signed by Tokuda and Shen both state,

> The terms of this Agreement are the final expression of my agreement with respect to the subject matter hereof and may not be contradicted by evidence of any prior or contemporaneous agreement.  This Agreement shall constitute the complete and exclusive statement of its terms. . . .  This Agreement may not be amended or waived except by a writing signed by me and by a duly authorized representative of the Company other than me.

Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 10-11, Ex. B, § 10-11.  Therefore, the Court finds that the Proprietary Agreements were intended as integrations, thus satisfying the first prong of the test described in *Wang*.  The second prong is likewise satisfied: Tokuda's and Shen's claims that the agreement "would never be used" against them is inconsistent with the Proprietary Agreements' explicit statement, quoted above, that the Proprietary Agreement "may not be . . . waived except by a writing signed by" the employee subject to the agreement and an authorized representative of the company.  Neither Tokuda nor Shen claim to have pursued nor received any such writing.  Because paragraph 9 of the Tokuda Declaration and paragraph 49 of the Shen Declaration are barred by the parol evidence rule, and given that Defendants do not oppose these objections, the Court SUSTAINS Plaintiff's objections and STRIKES these paragraphs.

United States District Court
For the Northern District of California

### 2.      All Other Objections

The Court DENIES all other objections as MOOT, as the court has not relied on other materials to which Plaintiff or Defendants object.

## C.      Estoppel

In their Opposition, Defendants Tokuda and Shen argue that Plaintiff cannot pursue its claims because of the doctrine of estoppel.  As Tokuda and Shen explain, the doctrine of estoppel has four elements: "(1) The party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury."  *Skulnick v. Roberts Espress, Inc.*, 2 Cal. App. 4th 884, 890 (Cal. Ct. App. 1992).  The reliance must be reasonable.  *Martinez v. Scott Specialty Gases, Inc.*, 83 Cal. App. 4th 1236, 1238 (Cal. Ct. App. 2000) (holding that "[e]stoppel requires, among other things, reasonable reliance on the other party's actions" and rejecting estoppel where "plaintiffs could not reasonably have been misled").

Tokuda and Shen argue that Plaintiff is estopped from enforcing the Proprietary Agreements because Plaintiff's CEO Jose Picazo allegedly informed Tokuda and Shen that the Proprietary Agreements were mere formalities and would never be enforced against them. Tokuda and Shen Opp. at 25.  As noted above, evidence of these assurances, provided in paragraph 9 of the Tokuda Declaration and paragraph 49 of the Shen Declaration, are barred by the parol evidence rule.  Indeed, the California Supreme Court has specifically held that the doctrine of estoppel does not affect application of the parol evidence rule.  *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 347 n. 7 (Cal. 2004).  Therefore, this argument is unavailing.

Tokuda and Shen also argue that the elements of estoppel are satisfied because Plaintiff "deceived the Individual Defendants, with full knowledge of defendants' activities, and created an impression that Defendants' activities were authorized."  Tokuda and Shen Opp. at 25. Tokuda and Shen argue that they "relied upon Iconix's clear message that it saw no conflict

9

United States District Court
For the Northern District of California

between rockmyspace and the [Shen's and Tokuda's] work at Iconix, and once they left Iconix they poured time and money into RockYou. They did not seek new jobs." *Id.* at 26.

Tokuda and Shen argue that Iconix learned of the existence of rockmyspace before Tokuda and Shen left Iconix. Tokuda and Shen Opp. at 25. Specifically, Tokuda and Shen refer to a conversation that Tokuda had with Bill Ames, Iconix's Vice President of Sales and Chief Operating Officer, in late January, 2006, in which Tokuda "told Ames about RockYou and showed him a presentation Tokuda had prepared." Tokuda and Shen Opp. at 20; Tokuda Decl. at ¶ 3. In response, Plaintiff argues that this does not indicate that Plaintiff was apprised of the facts. In his deposition, Tokuda admitted that when he met with Ames, he failed to mention that Shen was working on rockmyspace, that both Shen and Tokuda had been working on rockmyspace on Plaintiff's computers; or that other of Plaintiff's employees worked on rockmyspace. Reply at 32; Vaughan Decl. ISO Plaintiff's Objections, Ex. A, 263-266 (Tokuda Dep.). These are important facts, providing the basis for Plaintiff's claim against Shen and constituting some of the allegations that give rise to Plaintiff's causes of action for Breach of Fiduciary Duty, Breach of Contract, and Unfair Competition. FAC at ¶¶ 50, 59, 72.

Further, Tokuda and Shen argue that Plaintiff led them to believe that Plaintiff "had no issue with their work on the RockYou website." Tokuda and Shen Opp. at 25. In support of this understanding, Tokuda and Shen explain that, after Tokuda told Ames about rockmyspace in late January, a) Ames told Tokuda that he would help him find funding for Tokuda's company; b) Plaintiff entered into a consulting contract with Tokuda so that Tokuda "could provide continued service on demand"; and c) "[n]o one mentioned any concern to [Tokuda] about the work [he] was doing on the Rockmyspace website" (collectively, "Plaintiff's actions and inactions") Tokuda Dec. at ¶¶ 72-73. Tokuda and Shen cite to a rough, uncertified deposition of Chief Financial Officer Bill Zager, which explains that Plaintiff "had no desire to have a relationship with Dr. Tokuda," but "were deceiving" Tokuda "to see how deceitful he would be." Weinberg Decl., Ex. NN 96-97 (Rough Zager Dep.).

10

United States District Court
For the Northern District of California

As noted above, any reliance on Plaintiff's actions and inactions must be reasonable to satisfy the standard for estoppel. *Martinez v. Scott Specialty Gases, Inc*., 83 Cal. App. 4th 1236, 1238 (Cal. Ct. App. 2000). Plaintiff argues that any reliance by Defendants was unreasonable. Plaintiff states that it terminated Shen on February 1, 2006, "after learning of his involvement in rockmyspace." Wilbur Decl. at ¶ 42. Tokuda and Shen do not dispute this. To the contrary, Shen states he "was told that [his] work for someone other than Iconix (i.e. Net[p]ickle and the RockYou website) was grounds for termination." Shen at ¶ 63. On March 13, 2006, Plaintiff wrote to Defendants "demanding that they return the copyrighted materials and cease operating the rockmyspace website." Mot. at 14. Plaintiff argues that "Shen cannot contend that it was reasonable for him to rely on his understanding that Iconix saw 'no conflict' when he was fired for that very conflict. If there was any confusion on this point, it was extinguished six weeks later, when Iconix sent its cease and desist letter." Reply at 33. Further, the Proprietary Agreements that Tokuda and Shen both signed state, "This Agreement may not be amended or waived except by a writing signed by me and by a duly authorized representative of the Company other than me. Failure to exercise any right under this Agreement shall not constitute a waiver of such right." Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 11, Ex. B, § 11. This too weighs against the reasonableness of any reliance that Tokuda and Shen may have had upon Plaintiff's actions and inactions.

In sum, the Court finds that Tokuda and Shen have failed to satisfy the elements of estoppel, by failing to prove that Plaintiff was "apprised of the facts" at the time Plaintiff allegedly induced reliance on its actions and inactions and by failing to prove that their reliance on these actions and inactions was reasonable. Thus, the Court finds that Tokuda and Shen's arguments for estoppel are unavailing.

**D.      Preliminary Injunction**

For the reasons stated below, the Court GRANTS IN PART Plaintiff's Motion for

Preliminary Injunction.[4]  A party seeking a preliminary injunction must show either: "(1) a

_____

[4] Plaintiff's latest Proposed Order requests a preliminary injunction that would order the following:

(1) Defendants are required to hold in a constructive trust any and all revenues and profits derived from operations of netPickle, Inc., and the website rockyou.com; and to provide a proper accounting of all such revenues and profits to Iconix within 20 days of service of this ORDER;
(2) Defendants are required to hold in a constructive trust for the benefit of Iconix any and all issued and outstanding shares of capital stock of netPickle, Inc., and are prohibited from selling, transferring, or encumbering such shares (or otherwise granting any rights or interests in such shares), and from permitting netPickle to issue any further shares of capital stock, stock options or any other right or interest with respect to the capital stock of netPickle. Defendants are further directed to provide a proper accounting of all such shares to Iconix with 20 days of service of this ORDER;
(3) Defendants are prohibited from selling, licensing, or transferring the domain names rockmyspace.com or rockyou.com, and from using such domain names except in conjunction with the continuing operation of the website in accordance with paragraph 4 below;
(4) Defendants shall be permitted to continue to operate the rockyou.com website under the following conditions only:
    (a) Defendants shall obtain the prior, written approval of Jose Picazo, Chief Executive Officer of Iconix, for any material changes to the rockyou.com website or netPickle business;
    (b) Defendants shall obtain the prior, written approval of Mr. Picazo for any expenses or obligations associated with the rockyou.com website or netPickle business that are out of the ordinary course of business or that exceed $10,000;
    (c) Defendants shall provide biweekly reports to Mr. Picazo describing the financial condition of the company, any material events affecting netPickle, Inc. and the rockyou.com website, and any proposed material changes to the operations of netPickle, Inc. and the rockyou.com website; and
    (d) Defendants shall permit inspection of business records and documents on reasonable notice by Iconix's counsel to ensure compliance with the above.
(5) [Except in conjunction with the continuing operation of the rockyou.com website pursuant to the conditions set forth in paragraph 4 above,] All Defendants, their officers, directors, employees, servants, agents, and all persons in active concert and participation with any of them are prohibited from:
    (a) infringing Iconix's copyrights pursuant to 17 U.S.C. section 106 in any software code developed by defendants or anyone acting in concert with them during the time they were employed by Iconix.
    (b) making use of, transferring, distributing or reproducing the current version of software for the customizable animated slideshow tool and the rockyou.com website.
    (c) operating the website rockyou.com;
    (d) making use of a customizable, animated slideshow tool that is designed to allow a

United States District Court
For the Northern District of California

combination of probable success on the merits and the possibility of irreparable injury, or (2) that

serious questions are raised and the balance of hardships tips sharply in favor of the moving

party.  These standards 'are not separate tests but the outer reaches of a single continuum.'"

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839- 40 (9th Cir. 2001)

(citation omitted).

### 1.      Merits of the Claims

Plaintiff shows probable success on the merits of its claims.

### a.      Breach of Fiduciary Duty

Plaintiff argues that Tokuda owed a fiduciary duty to Plaintiff and its shareholders, which

he breached.

### i.      Evidence that Tokuda Owed a Fiduciary Duty

Under California law, "an officer who participates in management of the corporation,

exercising some discretionary authority, is a fiduciary of the corporation as a matter of law.

---

user to create slideshows that are portable and can be pasted into another website
environment or transmitted by e-mail;

(6) Within 10 days of service of this ORDER, [unless Defendants agree to continued operation of the website pursuant to the conditions set forth in paragraph 4,] Defendants are required to deliver to counsel for Plaintiff, or to erase, all copies of:

(a) any and all software relating to the customizable, animated slideshow tool, or the rockyou.com website that were created by Defendants, or anyone acting in concert with them during the time they were employed by Iconix, and all works derived therefrom;

(b) all versions of the software code for the customizable, animated slideshow tool; However, Defendants' counsel shall retain one copy of each of the above to be used for litigation, and not operational, purposes only;

(7) Defendants, their officers, directors, employees, servants, agents, and all persons in active concert and participation with any of them are prohibited from taking any action intended to impair the rockyou.com website or its user base, encourage rockyou.com users to migrate to another website, or discourage rockyou.com users from migrating to a website operated by Iconix.

Within twenty (20) days of service of this ORDER, each Defendant shall file with the Court and serve upon counsel for Plaintiff a sworn affidavit detailing the manner in which that Defendant has complied with the order.

Plaintiff's Third Revised Proposed Order.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Conversely, a 'nominal' officer with no management authority is not a fiduciary." *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*, 83 Cal. App. 4th 409, 420-21 (Cal. Ct. App. 2000), *overruled on other grounds*, *Reeves v. Hanlon*, 33 Cal. 4th 1140 (Cal. 2004).  "Whether a particular officer participates in management is a question of fact." *Id.* at 421.  On balance, Plaintiff presents convincing evidence that Tokuda owes a fiduciary duty to Plaintiff.

Tokuda and Shen argue that Tokuda "had no discretionary authority" and "had to seek Mr. Wilbur's [Vice President of Marketing] and/or Mr. Zager's [Chief Financial Officer and General Counsel] approval for everything, including contracts, hiring, and budget."  Tokuda and Shen Opp. at 33.  However, their citations for this assertion do not fully support this statement.  First, the excerpt from the Wilbur Deposition cited by Tokuda and Shen states, in relevant part:

> Q      . . . . Was it your understanding that Dr. Tokuda could simply hire Jian Shen and the person identified as Ryo without approval of anyone else?
> A.     I don't know exactly what the procedure was.  I know that in general in our company we were – we went in and out of this operating under budgets, where if you were within that budget, you may have the authority to do a certain amount of spending under that cap.  Generally, with hiring, I believe that there needed to be other people involved .

Weinberg Decl., Ex. I, 147-48 (Wilbur Dep.).  The Tokuda Declaration states in relevant part,

> I expected that I would be able to hire people within budget and set the compensation for the employees who reported to me.  I later learned that I would not have the authority to do either.  I also believed that I would be able to assess legal and other risks for the company when engaging in long term strategies and that, ultimately, the responsibility for decision making would be mine.  This did not happen at Iconix . . . .

Tokuda Decl. at ¶ 3.

By contrast, Plaintiff offers direct evidence of Tokuda's discretionary power that contradicts Tokuda and Shen's arguments: First, "Tokuda was the only person to interview Jian Shen before he was hired." Reply at 16 (citing Halpin Decl., Ex. 9, 21-23).  Second, "Tokuda hired the Romanian engineering team, Gemini, and signed an amendment to their agreement which bound Iconix for over a million dollars without consulting anyone else at Iconix." *Id.* (citing Halpin Decl., Ex. 6, 353-54).  In addition, as Vice President of Engineering Tokuda

14

managed the entire engineering department, "establish[ing] the overall objectives and initiatives" of that department.  *Id.* (citing Halpin Decl., Ex. 3, 47 (Tokuda Dep.)).  Most of Iconix's workers were in the engineering department, and these workers reported directly to Tokuda.  *Id.* (citing Halpin Decl., Ex. 29, ICON015231.  In February, 2005, this meant that 16 of the company's 24 employees and contractors reported to Tokuda; this number grew over time.  *Id.* (citing Wan Decl., Ex. 29, ICON015231; Halpin Decl., Ex. 13, 65-66).

Tokuda argues that as of September, 2005, his role at Iconix was nothing more than that of an "engineering line manager."  Tokuda Decl. at ¶ 30.  Plaintiff denies this characterization, but argues that even if it were true, it would not excuse Tokuda's conduct: under California law, "Even when an officer loses power or authority, that officer still owes a fiduciary duty to the corporation.  To divest himself or herself of this duty, the officer must resign the office." *GAB*, 83 Cal. App. 4th at 421.

On balance, Plaintiff makes a convincing argument that Tokuda was an officer of Plaintiff, with some discretionary authority, who thus owed a fiduciary duty to Plaintiff.

Under California law, as an officer with a fiduciary duty, Tokuda would have been required to exercise:

> the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers.

*Daniel Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d 791, 800 (Cal. Ct. App. 1962) (quotation omitted).  In *Daniel Orifice*, the defendant was the corporate plaintiff's chief engineer and officer, charged with developing and improving the corporation's products.  *Id.* at 796.  The court held that the defendant breached his duty to the corporation, when he secretly "developed an improved version of [one of the company's products]" and, instead of turning this over to the corporation, sought to open his own competing business through which to sell and personally profit from the improved product.  *Id.* at 795-800.  The court explained,

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

> There can be no doubt that [the defendant] breached his duties as an officer of the respondent corporation.  He was an officer in charge of an important part of the respondent's business and at the same time he was creating improvements to the respondent's product, he was concealing such improvements and stealthily doing all that was necessary to set up a competing business.

*Id*. at 800.

### ii.        Evidence that Tokuda Breached his Fiduciary Duty

Plaintiff specifically argues that Tokuda breached his fiduciary duty to Plaintiff by violating the corporate opportunity doctrine, which

> prohibits a fiduciary from acquiring, "in opposition to the corporation, property in which the corporation has an interest or tangible expectancy . . . . [A] corporate opportunity exists when a proposed activity is reasonably incident to the corporation's present or prospective business and is one in which the corporation has the capacity to engage."

*Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1392 (9th Cir. 1997) (quoting *Kelegian v. Mgrdichian*, 33 Cal. App. 4th 982 (Cal. Ct. App. 1995).  The Ninth Circuit explained that "whether or not a corporate opportunity exists is largely a question of fact to be determined from the objective facts and surrounding circumstances existing at the time the opportunity arises."  *Id*. at 1392 (citing *Kelegian v. Mgrdichian*, 33 Cal. App. 4th 982 (Cal. Ct. App. 1995)).

Applying the corporate opportunity doctrine standard, with respect to the first prong, Plaintiff argues that rockmyspace is "not just 'reasonably incident' but directly aimed at an area that Iconix was seeking to exploit, based upon a feature that it was seeking to implement."  Mot. at 18.  Evidence supporting this argument is discussed below.

In order to induce consumers to download Plaintiff's email ID product, Plaintiff sought to explore a viral marketing strategy.  Mot. at 5; Wilbur Decl. at ¶ 8-11.  Under a viral marketing strategy, "consumers do the marketing work for [a company]," generating market demand a) by spreading the word about a product and b) by using that product in locations on the Internet where other users will see the product and seek to obtain it for themselves.  *Id*. (citing Wilbur Decl. at ¶ 12).  Plaintiff decided to focus its viral marketing strategy on users of social networking websites, such as MySpace and Friendster.  *Id*. (citing Wilbur Decl. at ¶ 13).  Tokuda

16

United States District Court
For the Northern District of California

and Shen both felt strongly that Plaintiff should focus its marketing efforts on social networking website users and pushed for that strategy. *Id.* (citing Wilbur Decl. at ¶ 14). The strategy was as follows: when the social network users visited Iconix's website to obtain certain desirable features, Plaintiff would encourage them to download Plaintiff's e-mail ID software at the same time. Wilbur Decl. at ¶ 18. Tokuda agreed to take the lead in defining and developing the features that would be offered to advance Plaintiff's viral marketing strategy. Wilbur Decl. at ¶ 14. In his deposition, Tokuda stated that he understood that he was charged with proposing different viral marketing strategies to Plaintiff. Wan Decl, Ex. B, 162:8-13, 163:9-14 ("It was up to me to propose different strategies.") (Tokuda Dep.). Specifically, Tokuda's mission was to recommend and supervise development of features that would be attractive to social networking users. Mot. at 5 (citing Wilbur Decl. at ¶ 16). On October 5, 2005, Tokuda created an Iconix Marketing Requirement Document, describing the goal as seeking to "[i]mplement a minimal feature set which can be viral within social networks." Mot. at 6 (quoting Wilbur Decl. at ¶ 23, Ex. D, 1). In his deposition, Plaintiff's CEO Jose Picazo stated that he expected that both Tokuda and Shen would bring to him their best ideas with respect to a viral marketing strategy and would further disclose to the company all of their ideas with respect to a viral marketing strategy. Wan Decl., Ex. D, 124-25 (Picazo Dep.).

   To implement the viral marketing strategy, Plaintiff created a separate website, called Uberfuze, that was targeted directly at social networking users. Mot. at 6 (citing Wilbur Decl. at ¶ 22). The basic concept, which came from Tokuda and Shen, was to allow users to create a "portable profile" that would contain the features made available on Uberfuze, along with links to all of the different locations on the Internet where the users had a presence: "For example, if a user had several blogs, used an instant messenging service, and stored photos at another website, links to all of these locations would be contained in their profile." Wilbur Decl. at ¶ 32. "A miniature version of this profile, which is called a 'signature' or 'tag,' was designed to be portable so that it could be pasted by the user into social networking sites like MySpace, other websites

United States District Court
For the Northern District of California

such as blogs, or integrated into a users's e-mail." *Id.* One of the customizable features that can be included as part of the profile and tag is a "buddy icon," which is a photo or graphic selected by the user. *Id*. at ¶ 33.

One of the features that Tokuda proposed for Uberfuze was an animated slideshow that would rotate through a user's pictures: "The animated slideshow was to be based on Flash programming code. Flash enables visually interesting image transitions and multi-media effects, features that would be important to social networking users." Wilbur Decl. at ¶¶ 24-25. Plaintiff's CEO Jose Picazo, who has the final say on any dispute over product features, endorsed the Uberfuze strategy and the concept of including an animated slideshow in the next version of Uberfuze. Supp. Mot. at 9 (citing Wan Decl., Ex. D, 48-49, 126-27 (Picazo Dep.); Wilbur Decl. at ¶ 27. As an aside, Tokuda stated in his deposition that this tag with rotating pictures was not a "slideshow" because it did not have captions and "tell a story." Wan Decl., Ex B, at 194-95.

Sometime within the next month, Plaintiff's engineers discovered that MySpace was prohibiting its users from using Flash code with its website because of a security breach. Wilbur Decl. at ¶ 28. Plaintiff responded to this news by changing the animated slideshow feature from a short term objective to be implemented immediately to a medium term objective. *Id*. at ¶ 29. However, implementing an animated customizable slideshow for Uberfuze always continued to be part of Plaintiff's marketing plan. *Id.* The slideshow is listed, for example, as a top priority for Plaintiff's medium term plan for Uberfuze in the January 10, 2005 Product Plan Review. *Id*. and Ex. G., 6.

Shen, who conceived the idea for rockmyspace "around September" of 2005 admits that the idea was actually triggered by Tokuda and Shen's work at Iconix:

Q:     What triggered the idea?
A:     We had been doing a lot of worked related to social networks.
Q:     And when you say "we," who are you talking about?
A:     Me and the people at Iconix.

Supp. Mot. at 8 (quoting Wan Decl., Ex. A, 7-8 (Shen Dep.)). Shen explained that the initial idea for rockmyspace was to "do something viral for myspace," and acknowledged that at this

same time, Iconix was also looking to "do something viral for myspace." *Id.* (quoting Wan Decl., Ex. A, 10-11 (Shen Dep.)).  A document, dated September 27, 2005, features an agenda for a brainstorming session between Tokuda; Shen; and Shen's brother, Jian Shen, to propose a viral marketing strategy for the next release of Uberfuze.  *Id.* (citing Wan Decl., Ex. G, at ICONO12524; Wan Decl., Ex. A, at 98-99 (Shen Dep.)).  The agenda lists adding a "slideshow viewer" as one of the possible strategies.  Id. (citing Wan Decl., Ex. G, at ICONO12524).  In his deposition, Shen acknowledged that the document proposed discussing possible inclusion of this feature on Uberfuze.  *Id.* (citing Wan Decl., Ex. A, at 104-105).  Shen testified that the document predated Defendants' decision to pursue the rockmyspace website and the slideshow feature upon which it is based.  *Id.* (citing Wan Decl., Ex. A, at 107.)

Plaintiff argues that Defendants' January 30, 2006 description of the rockmyspace website to potential investors shows how similar it was to the idea that Iconix was itself pursuing during the same time period: "The site allows individuals to create a slideshow which they can post to their web page. . . .  Friends seeing the show can click a link to create their own show, providing a viral marketing effect."  Wan Decl., Ex. H.

Jeff Wilbur, Iconix's Vice President of Marketing, states in his Declaration that the animated slideshow feature on RockYou "is essentially the same concept that we discussed for Uberfuze—it allows a user to display multiple, rotating pictures and is portable, so that it can be implemented into social networking sites like MySpace."  Wilbur Decl. at ¶ 39.  Wilbur states further,

> I do not recall ever being told that the prohibition on using [F]lash code with MySpace had been resolved, and certainly was never told by Tokuda or Shen that they were implementing this feature or launching a website that was independent from Iconix.  If they had told me, I would have insisted that the feature be implemented for Uberfuze. . . .  Given their role at the company, and the mission that Tokuda was assigned to accomplish, this product and website should have been developed for Iconix.
>
> Moreover, it appears that even before Tokuda and Shen left Iconix, the rockmyspace website was experiencing precisely the sort of exponential viral growth of registered users that we were seeking with the viral marketing strategy that Tokuda was supposed to be implementing.  We would very much have

United States District Court
For the Northern District of California

wanted to implement this feature into Uberfuze, or to use the rockmyspace
website to generate downloads of the Iconix email ID product.

Wilbur Decl. at ¶¶ 40-41.  In his deposition, Plaintiff's CEO Jose Picazo echoed Wilbur

statement, stating that had Defendants disclosed the rockmyspace website to Iconix, Iconix

would have "implemented it."  Supp. Mot. at 10; Wan Decl., Ex. D, 126-49 (Jose Picazo Dep.).

According to Wilbur, "Uberfuze itself has been a huge disappointment," delivering only a "tiny

fraction of the number of users that [Iconix] [was] counting on getting from the site."  *Id.* at ¶ 35.


Plaintiff explains that the "target market was so similar for [Uberfuze and rockmyspace]

that in December 2005 Iconix unknowingly advertised on the rockmyspace website to try to

attract users to Uberfuze, never realizing that the site was actually being run by Tokuda and

Shen."  Paxson Decl. ¶¶ 16-23 ("I concluded that the [rockmyspace] website was aimed at

attracting exactly the same type of users that we were and that it would be a good place on which

to advertise").  In his deposition, Tokuda testified that he was aware that Iconix was seeking to

attract more registered users; yet, while an employee of Iconix, even as rockmyspace surpassed

Iconix in total registered users, and got to the point where it was attracting more registered users

in a single day than Iconix had accumulated in its entire history, Tokuda failed to disclose

rockmyspace to Iconix.  Supp. Mot. at 10 (citing Wan Decl., Ex. B, 287-290 (Tokuda Dep)).

On balance, Plaintiff presents convincing evidence that rockmyspace is "not just

'reasonably incident'" but was derived from Tokuda and Shen's work at Iconix and "directly

aimed at an area that Iconix was seeking to exploit, based upon a feature that it was seeking to

implement."  Mot. at 18.

With respect to the second prong of the corporate opportunity doctrine standard, Plaintiff

argues that "Iconix also had 'the capacity to engage' in the idea, since it was developed and

launched by Tokuda and Shen while they were on the Iconix payroll."  Mot. at 18.

Tokuda and Shen do not challenge Plaintiff's arguments that it had the capacity to engage

in the proposed activity.  Instead they argue that Tokuda had no duty to disclose rockmyspace to

United States District Court
For the Northern District of California

Plaintiff because Plaintiff was in the business of "branded email," and anything not directly tied to achieving email downloads was outside the scope of Iconix's business.  Opp. at 34.  Tokuda and Shen cite to a treatise for the proposition that "[t]o be implicated," by the corporate opportunity doctrine, "the opportunity must be within the line of business of the corporation or one in which the corporation has an interest."  Opp. at 33 (citing Balotti, THE DELAWARE LAW OF CORPORATIONS & BUS. ORGS. § 4.10).  This citation is unavailing: even were this treatise binding authority on this Court, which it is not, rockmyspace would certainly seem to be within the line of business "in [Plaintiff] has an interest," according to Plaintiff's evidence.

In the alternative, Tokuda and Shen argue that Plaintiff made clear to Tokuda that they were not interested in "building a website service that became RockYou."  Opp. at 34.  Tokuda and Shen argue that Zager and Ames both opposed Tokuda and Shen's proposal to create an email signature tag with rotating pictures.  Shen Decl. at ¶¶ 44, 46, 47.  Tokuda and Shen cite to an email from Zager in which he states,

> What is the cost of animated icons?  What is the human factors costs and support costs of teaching morons how to use this feature?  What will our infrastructure costs be to support 75x bigger icons and how big are the animation files?  What does this do to our already marginal performance?  What does this do to dial up people?  What is the market justification for this stuff?
> . . . .
> We are lost.  We need to focus on our business and stop all this non-sense.  We have a reasonable partner strategy.  This community stuff has nothing to do with that strategy.

Weinberg Decl., Ex. Q.  In his declaration, Shen explains that "Mr. Ames's reaction was in step with Mr. Zager's.  Mr. Ames saw our proposal as building social networking features that would make us direct competitors with companies like MySpace, Friendster, Livejournal, SnapFish, and Classmates, with whom Mr. Ames was pursuing partnerships."  Shen Decl. at ¶ 47.  Tokuda and Shen also quote from Wilbur's deposition, in which he testified, "the RockYou website—well, our—our plan was not to create a RockYou-type website; it was to have RockYou-type capability in our tag on Uberfu[ze]."  Weinberg Decl., Ex. I, 252 (Wilbur Dep.).

In its Reply, Plaintiff rebuts Tokuda and Shen's arguments as follows.  First, Plaintiff

United States District Court
For the Northern District of California

argues that Defendants admit a) that they never disclosed the rockmyspace website, Wan Decl., Ex. B, 287-90 (Tokuda Dep.), and b) that they never disclosed the idea of an embeddable slideshow to Plaintiff.  Halpin Decl., Ex. 3, 202 ("I don't recall ever discussing embeddable slide show at Iconix.") (Tokuda Dep.).  Plaintiff argues that Plaintiff could not have rejected an opportunity *that was never presented*.  Reply at 18.  Plaintiff also argues that the citation to Wilbur's deposition is taken out of context.  Plaintiff argues that Wilbur simply stated that, while the company had plans to use to use RockYou-type functionality, it did not have plans at the time to create a RockYou website.  Reply at 19.  Plaintiff states that this is "hardly surprising since, as noted above, Defendants admit they never proposed such an idea to Iconix."  *Id.* Plaintiff observes that Wilbur proceeds to state, in his deposition, that the RockYou website would have fit within the company's marketing strategy.  *Id.* (citing Weinberg Decl., Ex. I, 252 (Wilbur Dep.)).  An instant messaging conversation between users purporting to be Tokuda and Shen indicates that Shen had difficulty distinguishing between which ideas were purportedly for Iconix and which were for rockmyspace:

> phdlance [Tokuda's instant messaging username]: basically, a funny slideshow with email distribution support could make us viral
>
> mekateK [Shen's instant messaging username]: huh . . . oh rms . . . thats [sic] scary . . . I can't tell what ur [sic] talkin [sic] about . . . rms [rockmyspace] or ico [Iconix] . . . hehe

Reply at 9 (quoting Wan Decl., Ex. C., 248).

With respect to the Tokuda and Shen's citation to the email sent by Zager, Plaintiff argues that a) Zager did not have the authority to unilaterally reject product features, and b) Zager frequently expressed concerns about products or features, and that features or products were developed in spite of Zager's concerns.  Reply at 20 (citing Halpin Decl., Ex. 4, 285-87 (Wilbur Dep.)).  Plaintiff argues that it did not reject any of Tokuda's ideas.  Plaintiff cites to deposition testimony from Picazo explaining that none of Tokuda's proposed recommendations for the viral marketing strategy were ever rejected.  Reply at 19 (citing Halpin Decl., Ex. 2 141-42 (Picazo Dep.)).  Plaintiff cites to "an unbroken chain of company documents that show that the company

United States District Court
For the Northern District of California

continued to pursue the idea of . . . animating the Uberfuze tag with multiple pictures, from Defendants' conception of Rock[Y]ou, through their departure."  Reply at 21 (citations omitted).

Finally, Plaintiff cites to an instant messaging transcript in which Tokuda stated,  "yeah, we actually lucked out with iconix being so bad it was an easy call to leave versus trying to save them with our best ideas."  Halpin Decl., Ex. 24.  In his Supplemental Declaration, Tokuda seeks to clarify this statement, explaining that he had a) presented his best ideas and features to Iconix management and b) lobbied strongly in favor of those ideas for many months.  Tokuda Supp. Decl. at ¶ 6.  Tokuda explains that these ideas were rejected, so it was "an easy call to leave Iconix": in order to save Iconix, Tokuda claims that he would have had to convince the company to change its focus and adopt his ideas—something that Tokuda claims "was not going to happen."  *Id*. at ¶ 7.

On balance, Plaintiff presents convincing evidence of a breach of fiduciary duty based on the corporate opportunity doctrine: Tokuda acquired the rockmyspace website "in opposition to" Plaintiff; the rockmyspace website is at least "reasonably incident" to Plaintiff's present and prospective business and is an activity in which Plaintiff had a capacity to engage.  *Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1392 (9th Cir. 1997).  Plaintiff also presents convincing evidence of a breach of fiduciary duty based on the general standard announced in *Daniel Orifice*: like the defendant in *Daniel Orifice*, it appears that Tokuda failed "to refrain from doing anything that would . . . deprive [the corporation] of profit or advantage which his skill and ability might properly bring to it."  *Daniel Orifice Fitting Co. v. Whalen*, 198 Cal. App. 2d 791, 800 (Cal. Ct. App. 1962).

> **b.**      **Breach of Contract**

Plaintiff argues that Tokuda and Shen breached their Proprietary Agreements by failing to disclose, assign, and transfer the work they developed for implementing an animated slideshow tool and the website that they developed, launched, and operated while in Plaintiff's employ.  Mot. at 18.  Tokuda's and Shen's Proprietary Agreements both state:

a.      Assignment of Inventions.  I agree to assign and transfer to the Company, without further consideration, my entire right, title and interest (throughout the United States and in all other countries or jurisdictions), free and clear of all liens and encumbrances, in and to all Inventions. Such assignment and transfer to the Company shall be continuous during my employment as of the relevant time of development of each such Invention.  The Company may, in its sole discretion, agree to provide consideration for certain Inventions through a written agreement between the Company and the undersigned which specifically provides for such consideration; in all other cases, no consideration shall be paid.  The Inventions shall be the sole property of the Company, whether or not copyrightable or patentable or in a commercial stage of development.  In addition, I agree to maintain adequate and current written records on the development of all Inventions, which shall also remain the sole property of the Company.

b.      Inventions.  "Inventions" collectively means any and all ideas, concepts, inventions, discoveries, developments, know-how, structures, designs, formulas, algorithms, methods, products, processes, systems and technologies in any stage of development that are conceived, developed or reduced to practice by me alone or with others; any and all patents, patents pending, copyrights, moral rights, trademarks and any other intellectual property rights therein; and any and all improvements, modifications, derivative works from, other rights in and claims related to any of the foregoing under the laws of any jurisdiction, <u>except</u> Inventions excluded in Schedule A[5] and to the extent that California Labor Code Section 2870 lawfully prohibits assignment.  I understand that Section 2870(a) provides as follows:

> Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer *shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either: (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual and demonstrably anticipated research or development of the employer or (2) Result from any work performed by the employee for the employer.*

. . . .

f.      Disclosure.  I agree to disclose promptly to the Company all Inventions and relevant records.  I further agree to promptly disclose to the Company any idea that I do not believe to be an Invention, but is conceived, developed, or reduced to practice by me (alone or with others) while I am employed by the Company.  I will disclose the idea, along with all

---

[5] Schedule A was left blank for both Tokuda and Shen.  Thus, no Inventions were excluded as having been listed on Schedule A.  Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, Sched. A, Ex. B, Sched. A.

> information and records pertaining to the idea, and the Company will
> examine the disclosure in confidence to determine if in fact it is an
> Invention subject to this Agreement.

Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2, Ex. B, § 2 (quoting Cal. Lab. Code § 2870) (emphasis added).

Plaintiff argues that all of the work that Tokuda and Shen did relating to rockmyspace while employed by Iconix falls under the Proprietary Agreement. Plaintiff cites to Shen's deposition, in which he testified that he conceived of the idea for rockmyspace in the fall of 2005, based on his work at Iconix around that time. Reply at 11(citing Wan Decl., Ex. A, 7-8 (Shen Dep.)). Wan Decl., Ex. A., 7:16-8:15. Plaintiff argues that Defendants developed rockmyspace into a thriving website with hundreds of thousands of registered users by the time they left. Reply at 11 (citing Wan Decl., Ex. A., 155 (Shen testifies, in his deposition, that he had a "1 million user party" in early February, not long after he left Iconix.)) (By February 19, 2006, rockmyspace had already exceeded 1.1 million registered users. Wan Decl., Ex. 0, at NP002545.) Plaintiff cites testimony from Shen's transcript in which Shen admits not disclosing the development and implementation of rockmyspace to Plaintiff. Reply at 11 (citing Wan Decl., Ex. A, 268-69 (Shen Dep.). Plaintiff cites testimony from Tokuda's transcript in which Tokuda admits not disclosing rockmyspace to Iconix, until late January, 2006, in his meeting with Ames. Reply at 12 (citing Wan Decl., Ex. B, 261-62 (Tokuda Dep.)). Tokuda stated in his deposition that the purpose of this conversation was not to propose the idea for Iconix, but rather to try to get Ames' help in securing funding. *Id.* (citing Wan Decl., Ex. B, 273-74, 279 (Tokuda Dep.)). In that conversation with Ames, Tokuda requested that Ames not disclose Tokuda's involvement with rockmyspace to Zager or Iconix's marketing department. *Id.* (citing Wan Decl., Ex. B, 266 (Tokuda Dep.)).

Plaintiff argues that the exception provided by California Labor Code § 2870 (quoted as part of the above excerpt from the Proprietary Agreements) does not apply. Section 2870 provides an exception to assignment of the rockmyspace invention, only if Tokuda and Shen

25

United States District Court

For the Northern District of California

developed rockmyspace 1) entirely on their own time, 2) entirely without use of Iconix's

equipment, supplies, or facilities; *and* 3) rockmyspace did not relate to Iconix's business, or

actual or demonstrably anticipated research or development, or result from any work that Tokuda

and Shen performed for Iconix.  Supp. Mot. at 11; Cal. Labor Code § 2870.  Plaintiff argues that

section 2870 does not apply as an exception to assignment because "[t]here is overwhelming

evidence that Defendants used Iconix company equipment and resources to develop and operate

rockmyspace."  Mot. at 19.  Moreover, Plaintiff argues that even if there is such a thing as

"entirely on his or her own time," within the meaning of California Labor Code § 2870, for

senior start-up company employees like Tokuda and Shen, this work, using Iconix equipment

and resources, was completed, in part, during the regular workday—sometimes for the entire

day, and even in the middle of meetings.  *Id*.  Plaintiff argues that this work cannot be construed

as "entirely" on the employee's own time.

          First, in providing evidence of the usage of Iconix company equipment and resources,

Plaintiff cites to the Declaration of Eric Lindblom, the Director of Information Technology at

Iconix, which states that Lindblom's examination of the company computer used by Shen

revealed that the computer contained the "source code for the [rockmyspace] website and the

related applications used by the website, including the customizable slideshow application."

Lindblom Decl. at ¶ 5.  Lindblom states that he ran the source code and discovered that the

source code "generated a web site that is substantially the same as the rockmyspace website

which was on the [I]nternet on January 26, 2006."  *Id*.  Lindblom also discovered a database of

users of the rockmyspace service on Shen's company computer, as well as a bridge loan term

sheet and a taxpayer identification form for Netpickle that had been filled out.  *Id*. at ¶¶ 6, 10.

On Tokuda's company computer, Lindblom found a PowerPoint presentation for investors

labeled "netPickle.ppt."  *Id*. at ¶ 11.  The file had last been modified on December 20, 2005, at

4:23 p.m.  *Id*.  On Shen's computer, Lindblom also discovered logs of instant messaging

conversations, held between individuals logged in using the instant messaging identities of

United States District Court

For the Northern District of California

Tokuda and Shen; the messages sent from the user logged in with Shen's instant messaging username were sent from Shen's company computer. *Id.* at ¶ 12-15. Many of these conversations were held on weekdays, between the hours of 9:00 a.m. and 5:00 p.m., and featured discussion of the conceptualization, design, software, operation, and business of rockmyspace.com. *Id*. at ¶ 16-36. In particular, some of these conversations described and facilitated Tokuda's and Shen's actions in debugging and installing code for rockmyspace.com. *Id*. at ¶¶ 23, 25. One such instant messaging conversation was held while the user logged in as Tokuda was attending a meeting of Iconix executives. *Id*., Ex. G, 458 ("hey jia, in exec meeting").

Even putting aside use of Plaintiff's equipment and resources, Plaintiff argues that the exception provided by California Labor Code § 2870 does not apply because, for reasons explained in the section regarding Breach of Fiduciary Duty above, the animated slideshow tool and the website targeting social website users were "directly related to business Iconix was pursuing and to Iconix's anticipated research or development." Mot. at 19.

In their Opposition, Tokuda and Shen raise a variety of arguments against a finding of breach of their Proprietary Agreements. First, Tokuda and Shen argue section 2(f) of the Proprietary Agreements (quoted above) stands for the proposition that if Plaintiff determined that it did not wish to pursue its broadly coined definition of "Invention," no "assignment" under section 2(a) of the Proprietary Agreements was necessary. Tokuda and Shen Opp. at 26. However, this construction is not supported by the language of the Proprietary Agreement. The Proprietary Agreements request disclosure in order to determine whether an idea is an "Invention subject to this Agreement." Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2(f), Ex. B, § 2(f). The Proprietary Agreements do not suggest that assignment is unnecessary if the company does not wish to a pursue a particular "Invention." Far from challenging Plaintiff's argument that Tokuda and Shen failed to disclose rockmyspace to Plaintiff, Tokuda and Shen argue that they "only retained those things that were not usable in email and were directed at social networking, things

United States District Court
For the Northern District of California

that Iconix made clear it did not want."  Reply at 27.  The clear terms of the Proprietary

Agreements indicate that Tokuda and Shen did not have the discretion to retain any ideas.

Pursuant to section 2(f) of the Proprietary Agreements, they had to disclose not only all

Inventions, but also "any idea" that they did not believe to be an Invention so that Plaintiff could

determine whether or not the idea qualified as an Invention.  Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, §

2(f), Ex. B, § 2(f).  Thus, Tokuda and Shen's alternate argument that rockmyspace is not an

"Invention" because it is not original is also unavailing.  Tokuda and Shen Opp. at 27.  Tokuda

and Shen were still required to disclose rockmyspace.  Apart from the fact that the Proprietary

Agreement does not require that an Invention be original,[6] section 2(f) specifically states that

Tokuda and Shen were required to disclose "any idea" that they "do not believe to be an

Invention."  Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2(f), Ex. B, § 2(f).

     Further, Defendants argue that the rockmyspace slideshow and website cannot be

claimed under the Proprietary Agreement given the circumstances surrounding their limited use

of Plaintiff's equipment: 1) Shen used his Iconix computer on vacation to program the website

and 2) Iconix computers were used to handle minor operational issues.  Opp. at 27.  Tokuda and

Shen argue that Shen "programmed using the Iconix laptop on vacation as a dumb terminal to his

server and only used the Iconix laptop because Iconix asked him to take the laptop on vacation."

Tokuda and Shen Opp. at 27.  Tokuda and Shen also argue that "using Iconix computers for

personal purposes was allowed and Iconix never said it would lay title to such things."  Tokuda

and Shen Opp. at 27.   Tokuda and Shen cite to Shen's Declaration in which he states,

> I did a lot of personal activities, including work on my websites, on my Iconix
> laptop, because I did not have a laptop of my own.  I stored photos, video games,
> music, personal finance information, passwords, and many other personal files on
> the Iconix laptop.  I carried my laptop at all times because I was always on call
> for any website emergencies.  Mr. Picazo and Mr. Zager were aware of my use of
> the laptop for personal purposes and encouraged me having my laptop with me at
> all times.  In addition, Eric Lindblom, Iconix's Director of Information
> Technology, knew from November 2005 that I was doing some maintenance of

---

[6] Plaintiff nonetheless presents evidence that RockYou was original, as demonstrated by
its instant popularity and success.  Reply at 1-2.

the RockMySpace (later renamed Rockyou) website through the Iconix laptop I used. No one ever raised an objection or said I couldn't use the laptop for personal purposes.

Shen Decl. at ¶ 22.  Tokuda and Shen's argument is unavailing.  Regardless of whether use of Iconix computers for personal purposes was considered *acceptable*, the Proprietary Agreements clearly require that Tokuda and Shen *assign* and *transfer* all inventions to Plaintiff, unless those inventions were developed entirely on the employee's own time, without using the employer's equipment, supplies, facilities, or trade secret information.  Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2, Ex. B, § 2 (quoting Cal. Lab. Code § 2870).  Even then, as discussed above, the Proprietary Agreements provide an exception to this exception, requiring assignment and transfer of those inventions that either: (1) Relate at the time of conception or reduction to practice of the invention to the employer's business, or actual and demonstrably anticipated research or development of the employer or (2) Result from any work performed by the employee for the employer.  Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2, Ex. B, § 2 (quoting Cal. Lab. Code § 2870) (emphasis added).  Thus, even if it was considered acceptable for Shen to use his Iconix computer for personal use, any Inventions developed using that computer had to be assigned and transferred.  To the extent that Tokuda and Shen believed that the rockmyspace slideshow and website were not Inventions, they still had to disclose those ideas to Plaintiff, pursuant to section 2(f) of the Proprietary Agreements.

In response to Plaintiff's arguments that Tokuda and Shen worked on rockmyspace during business hours, Tokuda and Shen concede that they sometimes worked on maintenance of rockmyspace between the hours of 9:00 a.m. and 5:00 p.m.  Tokuda and Shen Opp. at 17 (citing Shen Decl. at ¶ 58).  They argue however, that given that the two often worked 14-16 hour days for Iconix or worked through the night, the idea that something was done on "work time" simply because it happened between 9:00 a.m. and 5:00 p.m. is artificial.  *Id.*  To clarify, in his Declaration, Shen does not speak in terms of working between 9:00 a.m. and 5:00 p.m., but states specifically that, "[s]ometimes, the operational work [on rockmyspace] spilled into work

United States District Court

For the Northern District of California

hours at Iconix."  Shen Decl. at ¶ 58.  Further, as noted above, Plaintiff presents evidence that Tokuda was having an instant messenging conversation about rockmyspace while participating in an Iconix executive meeting.  Even if "work time" is not properly circumscribed by the hours of 9:00 a.m. and 5:00 p.m., Tokuda and Shen fail to convincingly rebut Plaintiff's allegations that they worked on rockmyspace during work hours.  As noted above, the exception to the assignment and transfer provision of the Proprietary Agreements provided by California Labor Code section 2870 only applies to "an invention that the employee developed *entirely* on his or her own time."  Cal. Lab. Code § 2870 (emphasis added).

Finally, Tokuda and Shen argue that the Proprietary Agreements are unenforceable as against public policy, because they are open-ended, allowing any idea to be claimed as owned by Iconix, even if the idea is not within Iconix's anticipated line of business and was developed during the employee's free time.  Tokuda and Shen Opp. at 28.  This argument is unavailing.  As Plaintiff argues, the Proprietary Agreements are not open-ended and are not against public policy.  To the contrary, the scope of the Proprietary Agreements are limited by their explicit incorporation of California Labor Code § 2870, which provides the standard for the public policy of California on issues of invention assignment contracts.  Cal. Lab. Code § 2870(b) ("To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable.").  Even Tokuda and Shen's example is unavailing: by explicitly incorporating section 2870 in the Proprietary Agreements, Plaintiff relies on the explicit public policy of California in determining not to claim—contrary to Tokuda and Shen's argument—those ideas developed during the employee's free time so long as those ideas do not fall within the exceptions set forth in section 2870. Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2, Ex. B, § 2 (quoting Cal. Lab. Code § 2870) (emphasis added).

Instead of furthering their position, Tokuda and Shen's arguments, discussed above,

United States District Court
For the Northern District of California

merely provide further evidence that the rockmyspace slideshow and website were subject to the disclosure, assignment, and transfer provisions of the Proprietary Agreements because they were "conceived, developed, or reduced to practice by" Tokuda and Shen  while they were "employed by the Company."  Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2, Ex. B, § 2 (quoting Cal. Lab. Code § 2870) (emphasis added).  On balance, Plaintiff provides convincing evidence that section 2870 does not apply to excuse Tokuda and Shen's failure to assign and transfer rockmyspace to Iconix, and that Tokuda and Shen breached the terms of their Proprietary Agreements.

### c.       Copyright Infringement

Plaintiff argues that the copyright in the rockmyspace software developed by Tokuda and Shen, while working for Plaintiff, is Plaintiff's property under the terms of the Proprietary Agreements signed by Tokuda and Shen.  Mot. at 15.  Plaintiff argues that Netpickle[7] has infringed[8] and will continue to infringe this copyright.  Mot. at 15-17.

### i.       Copyright Ownership

On February 16, 2006, Plaintiff filed for an expedited copyright registration on the

---

[7] Plaintiff argues that Tokuda and Shen are responsible, along with Netpickle, for any acts of infringement.  Plaintiff cites to California case law for this proposition, arguing that Defendants have absolute control over the direction of Netpickle and a total unity of interest with it.  Reply at 22-23 (citing *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (Cal. Ct. App. 1962) ("Before a corporation's acts and obligations can be legally recognized as those of a particular person, and vice versa, it must be made to appear that the corporation is not only influenced and governed by that person, but that there is such a unity of interest and ownership that the individuality, or separateness, of such person and corporation has ceased, and that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice.") However, because Plaintiff fails to provide evidence that Defendants have absolute control over Netpickle and a total unity of interest with it, the Court is unable to find, at this stage, that Plaintiff's argument is availing.

[8] "To establish a claim for copyright infringement, plaintiff must show that 1) she owns the copyright in the allegedly copied work; 2) defendant had access to the work; and 3) plaintiff's and defendant's works are substantially similar. To show that two works are substantially similar, plaintiff must demonstrate that the works are substantially similar in both ideas and expression." *Frybarger v. International Business Machines Corp.*, 812 F.2d 525, 529 (9th Cir. 1987) (citation omitted).

software code for the rockmyspace.com website that Plaintiff obtained from Shen's company computer.  Mot. at 14 (citing Kuwayti Decl. at ¶ 12).  On March 6, 2006, Plaintiff received the certificate of copyright registration.  *Id.* (citing Kuwayti Decl. at ¶ 12).  As quoted above, the Proprietary Agreements explicitly assign copyrights in Defendants' inventions to Iconix. Kuwayti Decl., Ex. 1 ¶ 13, Ex. A, § 2, Ex. B, § 2.  As discussed above, the only exception to this assignment is provided by California Labor Code § 2870, which for the reasons stated above, does not apply in the instant case.

In its Opposition, Netpickle[9] ignores this argument and argues at length that the software cannot be owned by Plaintiff because it does not satisfy the "work for hire" doctrine.  Netpickle Opp. at 5-8.  Pursuant to 17 U.S.C. § 201(b), "In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."

While Plaintiff argues, in turn, that it *does* satisfy the "work for hire" standard, the "work for hire" standard is irrelevant, where the Proprietary Agreements assign ownership of the

---

[9] Netpickle claims that Tokuda and Shen transferred all assets related to the rockmyspace website—including the disputed software code—to Netpickle, as part of the incorporation of Netpickle in early January, 2006.  Netpickle Opp. at 2 (citing Tokuda Dep. at ¶¶ 75, 79).  To the extent that Netpickle seeks to argue that this transfer—which followed the original transfer of copyright to Plaintiff pursuant to the Proprietary Agreements—extinguished Plaintiff's ownership of the copyright, the argument is unavailing.  Pursuant to 17 U.S.C. § 205,

> As between two conflicting transfers, the one executed first prevails if it is recorded [with the Copyright Office], in the manner required to give constructive notice under subsection (c), within one month after its execution in the United States or within two months after its execution outside the United States, or at any time before recordation in such manner of the later transfer. Otherwise the later transfer prevails if recorded first [with the Copyright Office] in such manner, and if taken in good faith, for valuable consideration or on the basis of a binding promise to pay royalties, and without notice of the earlier transfer.

17 U.S.C. § 205.  Even putting aside questions of good faith and notice, Defendants do not claim that they registered the second transfer, as required pursuant to section 205.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

copyright to Plaintiff.  Although the Ninth Circuit has not addressed this issue, the leading

copyright treatise and other Circuits agree that "the parties may expressly agree that all works

produced by the employee during the period of the employment relationship shall belong entirely

to the employer" and that the "work for hire" doctrine applies only in the absence of such express

agreement.  1-5 NIMMER ON COPYRIGHT § 5.03 (explaining that the "work for hire" doctrine

governs in the "absence of an express agreement between an employer and employee as to which

of the works produced by the employee shall be deemed to belong to the employer"); *Eisenberg*

*v. Advance Relocation Storage, Inc.*, 237 F.3d 111, 116 (2d Cir. 2000) ("By contract, a worker

and a firm may agree that the worker will or will not have intellectual property rights to items

that she makes while working for the firm.  Such agreements are controlling regardless of

whether, in their absence, a worker would be characterized as an employee or an independent

contractor.  Indeed, in copyright work-for-hire cases, the question of whether a worker is an

employee or an independent contractor arises only after the court has determined that the parties

did not agree on the allocation of intellectual property rights. . . . a worker and a firm can enter

into a contract that explicitly delineates who holds intellectual property rights to worker-created

items . . . .") (citations omitted); *Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) ("It is undisputed

that [the programmer] and [employer] never signed a written agreement assigning ownership

rights in [the software programs].  We must therefore consider whether the program was a work

prepared by Aymes as an employee within the scope of his employment. If so, [software

programs] qualif[y] as a 'work made for hire' whose copyright belongs to Island as Aymes's

employer.); *Hays v. Sony Corp*., 847 F.2d 412, 47 (7th Cir. 1988) ("The work-for-hire doctrine . .

. assigns copyright to the employer in the absence of a contractual specification").  Therefore,

Plaintiff has presented convincing evidence that the copyright was assigned to Plaintiff.

In its Opposition, Netpickle states that it has asserted various counterclaims—including a

counterclaim alleging that Plaintiff committed inequitable conduct and/or fraud upon the United

States Copyright Office—against Plaintiff with respect to Plaintiff's registration of the code.

Netpickle Opp. at 8 n. 10, 9.  Netpickle states that the relief sought on the counterclaims will include invalidation of the registration.  *Id.* The Ninth Circuit has held that fraud on the Copyright Office can invalidate the copyright.  *Urantia Found. v. Maaherra*, 114 F.3d 955, 963 (9th Cir. 1997).  However, as Netpickle observes, the counterclaims are not at issue in the instant motion.  Netpickle Opp. at 8 n. 10.

### ii.    Copyright Infringement

Plaintiff observes that Netpickle does not challenge that Netpickle's use of Iconix-registered code or insubstantial variants of that code continued through at least mid-May 2006.  Reply at 26.  Plaintiff argues that using the code to operate and further develop the website necessarily involves making infringing copies of the software.  Mot. at 16.  Indeed, according to the Ninth Circuit, running copyrighted software, without ownership of the copyright or a license to run the software, constitutes copyright infringement: "[T]he loading of copyrighted computer software from a storage medium (hard disk, floppy disk, or read only memory) into the memory of a central processing unit ('CPU') causes a copy to be made.  In the absence of ownership of the copyright or express permission by licence, such acts constitute copyright infringement." *Mai Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 518 (9th Cir. 1993).  Netpickle does not challenge this proposition.  Thus, Plaintiff has provided *convincing evidence* that Netpickle has infringed copyrighted software owned by Plaintiff.

The parties raise serious questions regarding whether Netpickle continues to infringe Plaintiff's copyright.  Under the sliding scale test, a party seeking a preliminary injunction "need not demonstrate that he will succeed on the merits, but must at least show that his cause presents serious questions of law worthy of litigation." *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993).  "Serious questions" are those which are "substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberative investigation." *Senate of State of Cal. v. Mosbacher*, 968 F. 2d 974, 977-78 (9th Cir. 1992).  Netpickle argues that after Plaintiff filed the instant lawsuit, it

United States District Court
For the Northern District of California

> decided to completely replace the source code [for RockYou] out of an abundance
> of caution and because doing so was inexpensive. . . .  Netpickle completely
> replaced the prior source code (the code Iconix registered) with code developed
> independently by the contractors and other code that was developed by Shen and
> Tokuda either prior to or after their employment with Iconix.

Netpickle Opp. at 3 (citing Shen Decl. at ¶¶ 67-69).  However, Plaintiff observes that

Defendants' expert witness Robert Zeidman[10] found that 20% of the new RockYou source code

files that were written using the Flash programming language had "high correlation values" to

files in the copyrighted code.  Zeidman Decl. at ¶ 10.  Zeidman has offered several possible

explanations for this high correlation, including a) that the code might have been automatically

generated by software tools used by programmers to create Flash files, as well as b) copying.

Zeidman Decl. at ¶¶ 31, 32; Halpin Decl., Ex. 12, 33 (Zeidman Dep.).  However, Zeidman

explains that "[d]ue to time constraints, [he] [has] not been able to independently" research this

issue.  Zeidman Decl. at ¶ 32.  Plaintiff further observes that Zeidman and Defendant's other

expert only analyzed the parts of RockYou written using the php, Actionscript, and Flash

programming languages.  Zeidman acknowledged that RockYou was also written using the

HTML programming languages and did not know whether other parts of RockYou were written

in other programming languages.  Halpin Decl., Ex. 12, 63-64 (Zeidman Dep.).  Therefore,

Plaintiff argues that Defendant's expert analysis, comparing the two software programs, is

incomplete.  Reply at 29 n. 12.

---

[10] Zeidman is an engineer and the founder and president of Zeidman Consulting, which
provides engineering consulting to high-tech companies; he has been a computer software and
hardware designer since 1983 and holds fourteen patents.  Zeidman Decl. at ¶¶ 6, 8.  Zeidman
has served as an expert witness in twelve cases, including at least four where he claims to have
compared programming source code for evidence of copyright infringement.  Zeidman Decl., Ex.
A.  He has published extensively, including two articles on detecting source code plagiarism.
One such article was entitled "Detecting Source Code Plagiarism with CodeMatch"; CodeMatch
is the tool that Zeidman used for his analysis in the instant case.  *Id.*  He has a masters degree in
electrical engineering from Stanford University and bachelors degrees in electrical engineering
and physics from Cornell University.  *Id.*  Plaintiff does not challenge Zeidman's qualifications
as an expert witness to testify on similarities between software used by Defendants and the
software copyrighted by Plaintiff.

United States District Court

For the Northern District of California

Further, while Defendants object to the testimony of Plaintiff's expert witness, who argues that the "conceptual model, navigation, imaging, and look and feel" of the redeveloped RockYou website is "substantially identical" to that created by the copyrighted code, Defendants' own experts did not analyze these aspects of the RockYou website, reviewing only the source code of the programs.  Supp. Mot. at 6; Reply at 26 (citing Halpin Decl., Ex. 11, 12-16 (Shiflett Dep.); Halpin Decl., Ex. 12, 7 (Zeidman Dep.)).  Because copyright protection can, in some circumstances, extend to the visual aspects of a software program, such as its user interface, the expert analysis proffered by both parties is incomplete on this front as well. *Johnson Controls, Inc. v. Phoenix Control Systems, Inc*., 886 F.2d 1173, 1175 (9th Cir. 1989) (citation omitted). ("Computer software is subject to copyright protection.  A computer program is made up of several different components, including the source and object code, the structure, sequence and/or organization of the program, the user interface, and the function, or purpose, of the program.  Whether a particular component of a program is protected by a copyright depends on whether it qualifies as an 'expression' of an idea, rather than the idea itself.").

While the evidence does not yet point convincingly either toward or away from continued copyright infringement, the parties have raised serious questions on this topic, sufficient to warrant a preliminary injunction, if the other elements of the preliminary injunction standard are satisfied.  *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir. 1993).

### d.        Unfair Competition Law

Plaintiff argues that Tokuda and Shen violated California's Unfair Competition Law, which prohibits "any unlawful, unfair, or fraudulent business act or practice."  Cal. Bus. & Prof. Code. § 17200.  "By proscribing 'any unlawful' business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable.  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 180 (Cal. 1999) (quotation omitted). The California courts have held that a breach of fiduciary duty can provide the predicate unlawful act that gives rise to an

United States District Court

For the Northern District of California

Unfair Competition Law claim. *GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc*., 83 Cal. App. 4th 409, 425 (Cal. Ct. App. 2000).  Tokuda and Shen argue, without citing any authorities, that California's Unfair Competition Law "cannot be fairly read to cover the obligations of employees under the guide of a 'business' practice."  Tokuda and Shen Opp. at 29.  To the contrary, as Plaintiff argues, the California courts have held that a former employer may obtain a preliminary injunction, pursuant to an Unfair Competition Law claim, against a former employee for breach of the employee's obligations to the employer.  For example, in *ReadyLink Healthcare*, the California Court of Appeals affirmed a preliminary injunction against a former employee who a) stole—while still an employee—his employer's proprietary and confidential information and b) then sought to misappropriate that information.  *ReadyLink Heatlhcare v. Cotton*, 126 Cal. App. 4th 1006 (2005).  Tokuda and Shen also argue, without citing any authorities, that Plaintiff cannot seek injunctive relief, pursuant to the Unfair Competition Law, because the alleged violations have ceased and cannot possibly continue. Tokuda and Shen Opp. at 31.  To the contrary, as Plaintiff argues, the Unfair Competition Law clearly states "Any person who engages, *has engaged*, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof. Code § 17203 (emphasis added).  Plaintiff argues that it does not seek to enjoin Tokuda and Shen from breaching any duties that they no longer have, but rather seeks restitution of property and injunctive relief preventing Defendants from benefitting from the fruits of their wrongdoing. Reply at 31.

In addition, Plaintiff alleges other predicate unlawful activity:

First, Plaintiff argues that Tokuda and Shen each violated the Unfair Competition Law by breaching the duty of loyalty that they owed to Plaintiff under the California Labor Code. California Labor Code § 2859 states, "An employee is always bound to use such skill as he possess, so far as the same is required, for the services specified" by the terms of his employment.  Cal. Lab. Code § 2859.  California Labor Code § 2863 states, "An employee who

has any business to transact on his own account, similar to that intrusted [sic] to him by his employer, shall always give preference to the business of the employer.  Cal. Lab. Code § 2863. Plaintiff argue that Tokuda and Shen violated these Labor Code statutes by deliberately withholding their best efforts from their work for Plaintiff, retaining those efforts to serve their own competing interests, by secretly developing rockmyspace as their own company, instead of using the rockmyspace technologies—or at least disclosing the rockmyspace technologies—to serve Plaintiff's viral marketing needs.  Reply at 30.  While Tokuda and Shen argue that they "worked very hard" for Plaintiff, this proposition does not negate Plaintiff's arguments that Tokuda and Shen *also* used their efforts to serve their own interests, instead of those of Plaintiff. Reply at 30.

Second, Plaintiff argues that Tokuda and Shen violated the Unfair Competition Law by violating California Penal Code § 502(c), which states, in pertinent part, "any person who commits any of the following acts is guilty of a public offense":

> (2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.
> . . . .
> (4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

Cal. Penal Code § 502(c).  Plaintiff argues that Tokuda and Shen both violated section 502(c)(4) by deleting the rockmyspace files from their Iconix computers, without the permission of Plaintiff and in order to destroy incriminating evidence.  Supp. Mot. at 13 (citing Wan Decl., Ex. A, 293, 295 (Shen Dep.) (On the day that Shen was fired, "[he] chose to delete things that [he] didn't want people at Iconix to see."); Wan Decl., Ex. C, 441, 468 (instant messaging conversation between Tokuda and Shen on December 17, 2005) ("I [Tokuda] deleted almost everything with rockmyspace off my computer (not much there actually) in case I'm asked to leave")).  Plaintiff also argues that Shen violated section 502(c)(2) when, four days after he was

United States District Court
For the Northern District of California

fired, he had an Iconix employee upload source code that belonged to Iconix to a rockmyspace server.  Supp. Mot. at 13 (citing Wan Decl., Ex. A, 118-19, 123-24 (Shen Dep.)).  In their Opposition, Tokuda and Shen do not dispute Plaintiff's evidence, but merely claim that the code that Shen had an employee upload to a rockmyspace server was "based entirely off an open source platform called Mambo" and is separate from Iconix's email plug-in and web services code.  Tokuda and Shen Opp. at 31.  Tokuda and Shen describe Shen's conduct as a "momentary lapse of judgment" and state that Shen "never reviewed or accessed the uploaded materials."  *Id.* (citing Shen Decl. at ¶ 4).

On balance, Plaintiff has provided convincing evidence of violations of California's Unfair Competition Law.

### 2.     Irreparable Harm

For the reasons stated above, Plaintiff has shown probable success on the merits of it's various claims.  For the reasons stated below, Plaintiff also succeeds in showing irreparable injury.

Plaintiff argues that irreparable harm should be presumed in this case: "A copyright plaintiff who makes out a prima facie case of infringement is entitled to a preliminary injunction without a detailed showing of irreparable harm."  *Triad Sys. Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1335 (9th Cir. 1995).  "To make its required showing of copyright infringement, [the plaintiff] must prove (1) ownership of the copyrights and (2) copying of an expression protected by those copyrights." *Triad*, 64 F.3d at 1335.  In the instant case, Plaintiff has made out a prima facie case of copyright infringement, presenting proof of 1) ownership of the copyright—both through its copyright registration and its Proprietary Agreements—and 2) infringement by Defendants through at least mid-May 2006.  17 U.S.C. § 410 ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate.").  Because Plaintiff has demonstrated a reasonable

likelihood of success as to it's prima facie case of copyright infringement, Plaintiff is entitled to a presumption of  irreparable harm .

### 3. Scope of the Preliminary Injunction and Determination of the Bond

#### a. Scope of the Preliminary Injunction

The Ninth Circuit has held that "an injunction must be narrowly tailored . . . to remedy only the specific harms shown by the plaintiffs, rather than 'to enjoin all possible breaches of the law.'" *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).  *See also National Railway Labor Conference v. International Assoc. of Machinists and Aerospace Workers*, 830 F.2d 741 (7th Cir. 1987) (reviewing a district court's decision to grant a preliminary injunction to determine "whether the scope of the injunctive provisions is wider than that necessary to prevent irreparable harm").  As explained above, Plaintiff has succeeded only in showing irreparable harm arising out of past acts of copyright infringement.  The Court must therefore narrowly tailor its preliminary injunction to remedy that particular harm. The Ninth Circuit has held that "the basic function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits."  *Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (quotation omitted).  "[T]he status quo is not simply any situation before the filing of the lawsuit, but rather the last uncontested status that preceded the parties' controversy."  *Id.* (quoting *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000).  In *GoTo.Com*, a trademark infringement case, the Ninth Circuit held that the status quo which was to be preserved by the district court's preliminary injunction "existed before [the defendant] began using its allegedly infringing logo."  *GoTo.Com*, 202 F.3d at 1210.

Plaintiff seeks the injunctive relief described in note 4.  However, this relief is not narrowly tailored to preserve the status quo that preceded Defendants' copyright infringement, but is instead drafted broadly to also address the alleged harms for breach of the Proprietary Agreements, breach of fiduciary duty, and violation of the Unfair Competition Law.

40

United States District Court
For the Northern District of California

First, Plaintiff fails to show, let alone argue, that Plaintiff's proposed constructive trust on Defendants' assets, revenues, and profits is narrowly tailored to the irreparable harm arising out of copyright infringement.  To the contrary, in support of its argument for a constructive trust, Plaintiff cites a treatise referring to Plaintiff's breach of fiduciary duty claims: "Where a fiduciary is found to have usurped a corporate opportunity, courts will ordinarily impose a constructive trust on the property that is the subject of the claim."  Iconix's Brief on Scope of Prelim. Inj. at 1 (citing Balotti, DELAWARE LAW OF CORPORATIONS & BUSINESS ORGANIZATIONS § 4.36 (2006)).        Similarly, Plaintiff fails to show, let alone argue, that the following three conditions of its proposed preliminary injunction are narrowly tailored to the irreparable harm arising out of copyright infringement: 1) prohibiting Defendants from "selling, licensing, or transferring the domain names rockmyspace.com or rockyou.com, and from using such domain names except in conjunction with the continuing operation of the website"; 2) permitting Defendants to operate the rockyou.com website only under the management of Plaintiff's CEO; and 3) prohibiting Defendants "from taking any action intended to impair the rockyou.com website or its user base, encourage rockyou.com users to migrate to another website, or discourage rockyou.com users from migrating to a website operated by Iconix."  To the contrary, Plaintiff justifies these requests largely on the basis of its claims for breach of the Proprietary Agreements and breach of fiduciary duty.  Iconix's Brief on Scope of Prelim. Inj. at 3-4 ( "When a fiduciary seizes a corporate opportunity for himself 'the corporation may claim for itself all benefits so obtained.'  *Sequoia Vacuum Sys. v. Stransky*, 229 Cal. App. 2d 281, 286 (Cal. Ct. App. 1964).  Further, under their Agreements with Iconix, Defendants agreed to disclose, assign, and transfer to Iconix 'any and all ideas, concepts, inventions, discoveries, developments, know-how, structures, designs, formulas . . . .'").

By contrast, the following condition proposed by Plaintiff is narrowly tailored to preserve the status quo in regard to Plaintiff's claim of copyright infringement: "All Defendants, their officers, directors, employees, servants, agents, and all persons in active concert and

United States District Court

For the Northern District of California

participation with any of them are prohibited from: infringing Iconix's copyrights pursuant to 17

U.S.C. section 106[11] in any software code developed by [D]efendants or anyone acting in concert

with them during the time they were employed by Iconix."  While Defendants do not address, in

any significant detail, Plaintiff's Third Revised Proposed Order, Defendants refer to the

following language, from Plaintiff's Second Revised Proposed Order, as creating an overbreadth

problem: "All Defendants . . . are prohibited from . . . making use of, transferring, distributing, or

reproduce, the software code for the customizable animated slide show tool or any works based

upon or derived therefrom."  Plaintiff's Second Revised Proposed Order.  Admittedly, this

prohibition from Plaintiff's Second Revised Proposed Order could be interpreted to apply to

more than just Plaintiff's copyrighted code and derivative works[12] of that copyrighted code.

---

[11] 17 U.S.C. § 106 states as follows:

Subject to sections 107 through 122 [17 U.S.C §§ 107 through 122], the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

  (1) to reproduce the copyrighted work in copies or phonorecords;

  (2) to prepare derivative works based upon the copyrighted work;

  (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

  (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly;

  (5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and

  (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission.

[12] To qualify as a derivative work, the Ninth Circuit has held that 1) the work must exist in a "concrete or permanent form," 2) the work must substantially incorporate protected material from the preexisting work, and 3) the work must "be considered an infringing work if the material which it has derived from a preexisting work had been taken without the consent of a copyright proprietor of such preexisting work."  *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1100-12 (9th Cir. 1998).  To prove infringement, it must be shown that works are "substantially similar" in both ideas and expressions.  *Id*. at 1112.  Pursuant to 17 U.S.C. § 106, the copyright holder has the "exclusive rights" to "authorize" and "prepare derivative works based upon the

Defendants' concerns should be resolved by Plaintiff's language in the Third Revised Proposed Order, which 1) specifically identifies the copyrighted code subject to the proposed preliminary injunction and 2) narrowly tailors the protections surrounding that code to enforce Plaintiff's rights under 17 U.S.C. § 106.  It is not unusual for courts to prohibit infringement—including infringement pertaining to derivative works, *see* note 12—in preliminary injunctions for alleged copyright infringement.  In *LGS Architects*, the Ninth Circuit held, "Because [the plaintiff] is likely to succeed on the merits of its copyright infringement claim, the district court is directed to enter a preliminary injunction prohibiting [the defendant] from reproducing, distributing, publicly displaying, or creating derivative works based upon [the plaintiff's] architectural plans.*"* *LGS Architects Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150 (9th Cir. 2006).  Similarly, in *Cybermedia*, a copyright infringement case, Judge Fogel issued a preliminary injunction which ordered as follows:

> Defendants, their officers, directors, employees, servants, agents, and all persons in active concert and participation with any of them who receive actual notice of this Order are prohibited from directly or indirectly infringing CyberMedia's copyrights in the UnInstaller program, and from selling, licensing, leasing, transferring, distributing, reproducing, manufacturing or advertising any version of Norton Uninstall Deluxe, or any other works derived therefrom . . . .

*Cybermedia, Inc. v. Symantec Corp.*, 19 F. Supp. 2d 1070, 1080 (N.D. Cal. 1998) (Fogel, J.).

Plaintiff's request for relief goes too far, however, in requesting that the preliminary injunction

> preclud[e] Defendants from using "the current version of software for the customizable animated slideshow tool and the rockyou.com website" . . . . and "operating the website rockyou.com" . . . . and "making use of a customizable, animated slideshow tool that is designed to allow a user to create slideshows that are portable and can be pasted into another website environment or transmitted by e-mail."

Iconix's Brief on Scope of Prelim. Inj. at 4-6.  Plaintiff premises these requests a) on its argument that Defendants continue to infringe Plaintiff's copyrights and b) its claim for breach of the Proprietary Agreements.  First, to the extent that Defendants continue to infringe Plaintiff's

copyrighted work."

43

United States District Court
For the Northern District of California

copyright, an order prohibiting copyright infringement provides sufficient relief.  This is particularly true in light of the insufficiency of the evidence provided to the Court (discussed above) on the matter of whether and how Defendants continue to infringe Plaintiff's copyright. Defendants claim that the new code used by Defendants is "not substantially similar to the code that Iconix registered."  Def. Mem. Scope of Inj. at 4.  Second, to the extent that Plaintiff's proposals rely on Plaintiff's claim for breach of the Proprietary Agreements, they are not narrowly tailored to preserve the status quo in regard to Plaintiff's claim of copyright infringement.

Finally, Plaintiff's proposed preliminary injunction requests that Defendants deliver to counsel for Plaintiff, or erase, all copies of:

(a) any and all software relating to the customizable, animated slideshow tool, or the rockyou.com website that were created by Defendants, or anyone acting in concert with them during the time they were employed by Iconix, and all works derived therefrom;

(b) all versions of the software code for the customizable, animated slideshow tool;

However, Defendants' counsel shall retain one copy of each of the above to be used for litigation, and not operational, purposes only . . . .

Plaintiff argues this relief requires Defendants to return "code developed at Iconix only." Iconix's Brief on Scope of Prelim. Inj. at 6.  For support, Plaintiff cites to *Cybermedia*, in which Judge Fogel ordered that the defendants deliver to Plaintiff's counsel "any and all copies of [the infringing software product] or any works derived therefrom" and "any and all copies of source code for any version of [the software bearing a copyright], excluding copies of . . . source code provided to Defendants' counsel in connection with this action."  *Cybermedia*, 19 F. Supp. 2d at 1080-81.  However, Plaintiff's request here is much broader than the order in *Cybermedia*, including software that may not infringe on Plaintiff's copyright.  The Court thus follows the example of *Cybermedia* in drafting this provision narrowly to refer only to the copyrighted software and derivative works of that software.

Limiting the scope of the preliminary injunction in the manner described above is in

accord with the spirit of Defendants' proposal that the "appropriate injunctive relief at this time

is to preclude Defendants from using the technology that Plaintiff purports to own." Def. Mem.

Scope of Inj. at 1-2. Defendants' specific proposal is unacceptable because it allows for a

prohibition of the use, sale, licensing, or transfer of the domain rockmyspace.com: this

protection is not narrowly tailored to the harm of copyright infringement. Apart from this issue,

however, Defendants agree to the broad outline of relief described by the Court above: their

proposed preliminary injunction would enjoin use, transfer, distribution, or

reproduction—activities all covered under 17 U.S.C. § 106, *see* note 11—of Plaintiff's

copyrighted code and would require Defendants to return to Plaintiff or erase all copies of

Plaintiff's code, except that Defendants' counsel shall be permitted to retain one copy of any such

software code to be used for litigation, and not operational, purposes only.

The final scope of the preliminary injunction approved by the Court, based on this

analysis, is set forth below, in the Conclusion.

### b. Bond

Pursuant to Federal Rule of Civil Procedure 65(c),

> No restraining order or preliminary injunction shall issue except upon the giving
> of security by the applicant, in such sum as the court deems proper, for the
> payment of such costs and damages as may be incurred or suffered by any party
> who is found to have been wrongfully enjoined or restrained. No such security
> shall be required of the United States or of an officer or agency thereof.

The Ninth Circuit has held "that a party has been wrongfully enjoined within the meaning of

Rule 65(c) when it turns out the party enjoined had the right all along to do what it was enjoined

from doing." *Nintendo of Am. v. Lewis Galoob Toys*, 16 F.3d 1032, 1036 (9th Cir. 1994).

Defendants state that only a nominal bond would be required if the preliminary

injunction were limited to Defendants' Proposed Order. *Id*. at 2. While Defendants' proposed

order does not expressly cover derivative works, as explained above, its prohibition on

"reproducing" Plaintiff's copyrighted code appears to implicitly cover derivative works: as noted

in Note 12, a derivative work "must substantially incorporate protected material from the

United States District Court
For the Northern District of California

preexisting work." *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1100-12 (9th Cir. 1998). Further, Defendants have not expressed any concern about a preliminary injunction that would cover derivative works.  Again, Defendants claim that the new code used by Defendants is "not substantially similar to the code that Iconix registered."  Def. Mem. Scope of Inj. at 4. Tokuda has stated, "We have no intention of using any code created by anyone while at Iconix.  That code has all been completely re-written by outside parties."  Tokuda Supp. Decl. at ¶ 27. Therefore, according to Defendants' allegations, the software currently used by Defendants would not constitute a derivative work of Plaintiff's copyrighted software.  *See* note 12. Defendants concerns are targeted, instead, at Plaintiff's request for some operational control of RockYou and prohibitions on Defendants' use of non-infringing software.  "Should the Court enjoin the use of any software, other than the copyrighted software, it would shut RockYou down, and an appropriate bond should be nothing less than $27,965,000."  Def. Mem. Scope of Inj. at 7.  Specifically, Defendants express concern that a preliminary injunction will force Defendants to 1) surrender operation control of the RockYou website and require regular reporting to Plaintiff on all important business decisionmaking, 2) operate under a constructive trust, and 3) preclude Defendants from creating non-infringing software.  *Id.* at 1, 4-5.  Because Defendants do not challenge Plaintiff's wish to protects the rights granted to it as a copyright holder, pursuant to 17 U.S.C. § 106, it appears that Defendants do not request anything more than a nominal bond for the preliminary injunction described in full detail below.

Defendants do not clarify what would constitute a "nominal bond."  Plaintiff proposes a "nominal bond of up to $50,000" for the relief described in note 4.  At the hearing on this matter, Plaintiff also referred a bond of up to $100,000 as being "nominal."  However, where Defendants claim that they are not infringing Plaintiff's rights as a copyright holder and where the preliminary injunction issued by the Court is a subset of the relief sought by Plaintiff, it does not appear necessary to order a bond valued in the upper reaches of the range approved as "nominal" by Plaintiff.  In *Cybermedia*, Judge Fogel based his determination of an appropriate bond on the

lost profits and expenses that the defendant would incur from the imposition of the preliminary

injunction which barred use and sale of defendant's infringing software and ordered a recall of all

unsold copies. *Cybermedia*, 19 F. Supp. 2d at 1079-80 (ordering a bond in the amount of

$1,630,000).  In the instant case, Defendants claim that they are not using the code that would be

protected by the preliminary injunction; therefore, there is no need to calculate a bond based on

lost profits or expenses that would result from imposition of the preliminary injunction.  In light

of the above, a bond in the amount of $10,000 appears appropriate—falling within the range

provided by Plaintiff's understanding of the term "nominal" (to which Defendants have not

objected) and providing the "nominal" security that Defendants seek.

## CONCLUSION

In view of the Defendants' objection to the new evidence and argument in Plaintiff's

Reply, the Court accepts the supplemental declarations filed with Defendants' objection, thus

providing Defendants with a chance to respond.  Further, because paragraph 9 of the Tokuda

Declaration and paragraph 49 of the Shen Declaration are barred by the parol evidence rule, the

Court SUSTAINS Plaintiff's objections to these paragraphs and STRIKES these paragraphs.

The Court DENIES all other objections as MOOT, as the Court has not relied on other materials

to which Plaintiff or Defendants object.

IT IS HEREBY ORDERED, for the reasons stated above, that the Court GRANTS IN

PART Plaintiff's Motion for Preliminary Injunction as follows:

1) All Defendants, their officers, directors, employees, servants, agents, and all persons in

active concert and participation with any of them are prohibited from making use of,

transferring, distributing or reproducing any implementations of technology, including software

code, created by any person while that person was an employee of Iconix, Inc.

2) All Defendants, their officers, directors, employees, servants, agents, and all persons in

United States District Court
For the Northern District of California

active concert and participation with any of them are prohibited from infringing Plaintiff's copyrights, pursuant to 17 U.S.C. § 106, in any software code developed by Defendants or anyone acting in concert with them during the time they were employed by Plaintiff;

3) Within 10 days of service of this Order, Defendants are required to deliver to counsel for Plaintiff, and to erase, any and all copies of software that would infringe Iconix's copyrights, pursuant to 17 U.S.C. § 106, in any software code developed by Defendants or anyone acting in concert with them during the time they were employed by Plaintiff; except that  Defendants' counsel shall be permitted to retain one copy of any such software code to be used for litigation, and not operational, purposes only.

4) Defendants are prohibited from using, selling, licensing or transferring the domain name rockmyspace.com.

5) Within 20 days of service of this ORDER, each Defendant shall file with the Court and serve upon counsel for Plaintiff a sworn affidavit detailing the manner in which that Defendant has complied with this Order.

This Order shall become effective immediately upon Plaintiff's posting of a bond in the amount of $10,000.


IT IS SO ORDERED.


Dated: 9/25/06

SAUNDRA BROWN ARMSTRONG

United States District Judge

United States District Court
For the Northern District of California